# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

UNITED STATES OF AMERICA      )
                                 )
      Plaintiff,             )
                                 )     Case No. 3:10-cr-00009
v.                           )     JUDGE HAYNES
                                 )
JEREMY SETH TUMMINS,      )
                                 )
      Defendant.         )

## A M E N D E D   M E M O R A N D U M

The United States of America filed this criminal action against Defendant Jeremy Seth Tummins, charging him with receipt and possession of child pornography.

Before the Court is the Defendant's motion to suppress (Docket Entry No. 21) and supporting memorandum (Docket Entry No. 36), to which the Government has responded (Docket Entry No. 44). Also before the Court is the Government's motion to strike the Defendant's version of the transcript of the search warrant execution. (Docket Entry No. 52).

The Government's motion challenges the 109 page transcript filed by the Defendant on the morning of the suppression hearing. The Government argued that the Government's counsel lacked adequate time to review the transcript for its accuracy. The Court took the motion to strike under advisement and afforded the Government's counsel time to review and to make specific challenges to this transcript. As the Government has not objected to the transcript, the Government's motion to strike should be denied as moot.

In his motion to suppress, Defendant argues that "the statements solicited from the Defendant in this case deprived the Defendant of his Fifth Amendment rights against self-incrimination and his Sixth Amendment right to counsel." (Docket Entry No. 37 at 7).

cv

Defendant seeks the suppression of his incriminating statements to the Dickson County Sheriff's detectives who questioned him during their execution of a search warrant at his residence in Dickson, Tennessee that resulted in the pending charges. The Court held a suppression hearing on April 15, 2011.

For the reasons stated below, the Court concludes that the Defendant's motion to suppress should be granted because the totality of circumstances of the officers' home interview establishes a police dominated environment that caused the Defendant to be in custody and subject to interrogation under Miranda[1] and its precedents. From the commencement of this interrogation, without any warnings or Miranda warnings, the officers questioned the Defendant on subjects that the officers knew would elicit incriminating statements. The officers failed to provide **any** Miranda warnings at **any** time during the approximately two hours of their interrogation of the Defendant that resulted in his oral and written incriminating statements. Under Supreme Court and Sixth Circuit precedents, Miranda must be strictly enforced and such deliberate tactics to circumvent Miranda require the suppression of the Defendant's statements.

### A. Findings of Fact

### 1. The Suppression Hearing

On May 11, 2009,[2] during "daytime in the evening," Detective John Patterson and Lieutenant Scott Levasseur of the Dickson County Sheriff's Office arrived at the Defendant's residence to execute a search warrant at the Defendant's home. These officers are members of a cyber-crimes unit that investigates internet crimes against children. The objects of the search

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

[2] The Court notes that Detective Patterson testified that the search warrant was executed on May 18, 2009, but the tape transcript and Defendant's papers state that the search occurred on May 11, 2009.

2

warrant were computers at the Defendant's residence, described as containing child pornography. Neither the search warrant nor the officer's affidavit for the warrant was presented at the suppression hearing. Yet, the transcript of the actual search of Defendant's residence reveals a reading of a portion of the search warrant that the state trial court issued. The search warrant was based upon a probable cause finding, tying the Defendant to possession of child pornography on the Defendant's computer. The warrant authorized the "search of the residence and vehicles for computers [found] **to be in possession of Jeremy Tummins** at 111 Saddle Creek Circle in Dickson," Tennessee. (Docket Entry No. 51-1, Transcript at 23) (emphasis added). As discussed infra, Lieutenant Levasseur earlier conducted an internet search that tracked two child pornography files that were downloaded onto the Defendant's computer in April 2009. (Docket Entry No. 51-1, Transcript at 24). In addition, prior to the search, Patterson's investigation revealed that the Defendant was a school teacher.

Patterson was the only witness at the suppression hearing. According to Patterson, the officers arrived at Defendant's residence wearing plain clothes in an unmarked vehicle. Their service weapons were holstered on their hips. The officers did not use their handcuffs. The officers remained at Defendant's residence for approximately two hours asking Defendant questions, collecting evidence, and answering questions. According to Patterson, Defendant made numerous incriminating statements, but the officers did not read Defendant his Miranda rights. Patterson recalled hearing Lieutenant Levasseur instructing Defendant that he did not have to answer questions, but does not identify when this instruction was given. Defendant was not arrested that day. Patterson testified that Defendant became a suspect when, once inside the residence, the officers learned that the Defendant utilized a cable modem and did not have wireless access for his computer.

As to movement within the Defendant's house, Patterson was not always in the same room with the Defendant who was with Lieutenant Levasseur. At times, Patterson and Mrs. Tumminis were apart from Lieutenant Levasseur and the Defendant. At one point, Defendant was left alone. Patterson testified that the only restriction on Defendant's freedom of movement was that the Defendant could not touch the computers. Yet, as set forth infra, Lieutenant Levasseur instructed Defendant to move to different parts of the house and issued instructions, such as "follow me upstairs." Patterson explained that participant's movements occurred because the conversation was low key, the Tumminses were cooperative, and the environment was not hostile. Yet, Patterson conceded that at one point, Lieutenant Levasseur's manner and tone of his voice became "more aggressive" when Defendant revealed that he was a school teacher. As discussed infra, Defendant's wife described Lieutenant Levasseur's tone as "very harsh" and "automatically accusing." The Defendant was visibly upset and was crying during the latter encounter.

Lieutenant Levasseur whom the transcript of the interrogation and search warrant execution reveals to be the aggressive questioner and who was with the Defendant throughout the interrogation did not testify at the suppression hearing.

## 2. The Transcript of the Interrogation and Search[3]

The officers made an audio recording of their execution of the search warrant and questioning of the Defendant. (Exhibit 1 to the Suppression Hearing; Docket Entry No. 51-1, Transcript of audio recording). The following findings are based upon a court reporter's

---

[3] This section includes lengthy quotations from the transcript of the search and interrogation because as discussed infra, the applicable law requires a fact intensive analysis of whether officers' questioning Defendant at his residence required Miranda warnings. For such an issue, the Court must consider "the surrounding circumstances and the entire course of police conduct." Oregon v. Elstad, 470 U.S. 298, 318 (1985).

4

transcription of the search warrant execution and the officers' questioning of the Defendant and his wife at the Defendant's residence.

Upon the officers' arrival to execute the search warrant tying the Defendant's computer to the child pornography, Lieutenant Levasseur introduced himself and Patterson, then asked the Defendant "can we come in and talk to you for a minute" because the officers are "doing an investigation." Id. at 3. From pages three through five of this transcript, Lieutenant Levasseur questioned the Defendant and secured answers from him about the Defendant's connection to the internet, whether the Defendant had cable and how long, Defendant's cable internet provider and whether the Defendant had wireless access. When the Defendant stated that he used a cable modem, Lieutenant Levasseur stated: "We're going to need to talk." Id. at 5. Lieutenant Levasseur then told the Defendant "to have a seat if you would." Id. Defendant asked his wife to come upstairs because the discussion was serious and she did. Id.

Lieutenant Levasseur next asked about the frequency of the Defendant's use of the computer, the number and location of the computers in the house, if Defendant knew of a "Limewire" application and if the Defendant had a "Limewire" connection to which the Defendant responded that he previously "had Limewire." Id. at 6. Lieutenant Levasseur then explained that he had identified some child pornography from an Internet Protocol (IP) address tied to the Defendant's residence and the officers were there to execute a search warrant. Id. at 7. From that point to page thirteen, Lieutenant Levasseur questioned and secured answers from the Defendant about the Defendant's file sharing, Defendant's use of his computer, Defendant's downloading of pornography from Limewire, Defendant's encounters with child pornography while downloading, Defendant's deletion of child pornography from his computer, and the

number of times Defendant downloaded "pretty graphic" movies since December 16, 2008, including the number of known child pornography movies.

Lieutenant Levasseur performed some type of inspection of the Defendant's computer, found Defendant had a shared folder and asked why Defendant clicked on Limewire. Lieutenant Levasseur explained his training as a certified computer forensic examiner and ability to find the information on the Defendant's computer. (Docket Entry No. 51-1 at 3-13). Lieutenant Levasseur also disclosed his and Patterson's membership on the federal task force for internet crimes against children. Lieutenant Levasseur's and Defendant's discussion then revealed the following pertinent statements:

> Lieutenant Levasseur: **"I'm going to be taking all pertinent things that are in my search warrant with me for an examination. I'm going to do a quick preview here tonight but I want you to know something, A, I don't take people lying to me. You need to be honest with me. You are not under arrest right now. I'm not here for you; I'm here for your computer, okay."**
>
> *     *     *
>
> Lieutenant Levasseur: "if you are honest with me and you cooperate, **things can work at a less than higher level than they normally will. I have two options when it comes to cases like this. . . I can take it federally or state . . . [.]"**
>
> *     *     *
>
> Lieutenant Levasseur: "If you are not honest with me and you are lying to me and I do a forensic exam and find out that you were lying to me, **I'm going to prosecute you to the fullest extent of the law."**

Id. at 13-14, 20 (emphasis added).

At page 18 of the transcript, Lieutenant Levasseur asks the Defendant about other computers and at page 21 talks about "collecting evidence and any computers." Lieutenant Levasseur serves the Defendant with the warrant, but continues to question the Defendant and instructs the Defendant:

> **"So if you are going to remember anything you need to do it before I leave because once I leave I consider it - - I have got you,** you have tried to be honest as you can be and if I prove you are wrong . . . ."

Id. at 21 (emphasis added).

After a description of the warrant, Lieutenant Levasseur again discussed his downloading of two child pornography films from the Defendant's computer and again questioned the Defendant about his internet connection and wireless access, Defendant's iPod, other users of Defendant's computers, and whether the Defendant was a pedophile. The Defendant's responses to these inquiries included: "Now, I'm afraid that y'all will leave here thinking I'm being dishonest with you and I just don't remember," id. at 27, and "**I guess I have to tell you.**" Id. at 27 (emphasis added). After some apparent viewing of the Defendant's computer, Lieutenant Levasseur states: "This is more than a one-time event and the file names are unmistakable, **you have got to give me a better explanation than you gave.**" Id. at 28 (emphasis added). Lieutenant Levasseur then explains his forensic search and his familiarity with Limewire and again states: "**I need you to tell me what the truth is.**" Id. at 29-30 (emphasis added). Lieutenant Levasseur cited his need to determine if "somebody who downloads child porn is also a pedophile . . . **and I need to address those issues**." Id. at 29-30 (emphasis added).

Patterson asked if the Defendant ever typed in an age range for children. Id. at 31, 32. When Defendant responded that he did not remember, Lieutenant Levasseur stated "saying that you don't remember is a way for you not to be honest with me." Id. at 32. Lieutenant Levasseur's subsequent discussion revealed the following statements by him:

> Lieutenant Levasseur: "I'll tell you straight up right now. If the investigation proves that you haven't been perping on kids and you are not a pedophile, it's not going to go that hard on you if you are honest with me. But if you are not honest with me . . . **I don't need to talk to you because I know what I've got and I**

7

**know what I'm going to find and I can just take your stuff and go. I'm
giving you the opportunity to help yourself. . . [.]"**

\* \* \*

Lieutenant Levasseur: **"I'm not saying you are a pedophile but you have to
give me some type of explanation as to why you would knowingly download a
file that is saying it's child porn and then watch it and then delete it. You've
got to explain to me – you have to make me believe that, A, you are not a
pedophile and you are not going to do that with the explanation you are
giving."**

\* \* \*

Lieutenant Levasseur: **"I want him to convince me that he is not [a
pedophile]… All I ask, I'm only going to ask it one more time and I'm not
asking it again. I want an explanation as to why you would do it, why you
would download those files to your computer.** That's all I'm asking for is an
explanation and I'm not going to ask again. **You know, you don't have to
answer.** It doesn't really matter to me but I would like to –."

Id. at 35, 43, 45 (emphasis added).

At this point, Mrs. Tummins interrupts and asks the Defendant questions

regarding downloading child pornography, id., but a discussion arises between Lieutenant

Levasseur and the Defendant's wife about the tone of the interview.

Lieutenant Levasseur: "Ma'am, **I apologize if you think I was being a little
harsh** with y'all but like I told you before this is what I do for a living and I know
when somebody is giving me the runaround."

Ms. Tummins: "My husband is not giving you the runaround."

\* \* \*

Ms. Tummins: "We have never had to deal with anything like this before. We
are not used to having the law people come in to our home and especially, you
know, I mean, **you were very harsh here.**

Id. at 48-49 (emphasis added). Lieutenant Levasseur tells the Defendant's wife: "I was

only seeking the truth out of concern for children. You got to understand that." Id. at 72.

Lieutenant Levasseur apologized that he upset her. Id.

Ms. Tummins: "I mean **you are automatically accusing him** . . . You came in and you said, let me give you a chance to tell me what you can and he . . .[.]"

Lieutenant Levasseur: "Okay, I'm sorry, I won't ask anything else."

Id. at 50 (emphasis added).

After some additional discussion about the seizure process and Patterson's brief discussion with the Defendant's wife, Lieutenant Levasseur resumes his interrogation of the Defendant with the following statements in the transcript.

Lieutenant Levasseur: "**I got you dead to rights for this - - this child porn. But I need you to make me believe that you are not a danger to children.**"

\* \* \*

Lieutenant Levasseur: "**Well, I need you to look at me straight in the face.**"

Defendant: "Okay, all right."

Lieutenant Levasseur: "**Straight as you can. Close your eyes. Don't blink. Don't do nothing. Have you ever molested any kids?**"

Defendant: "Absolutely not."

\* \* \*

Lieutenant Levasseur: "**Now, listen to me, watch me; stop crying** . . . [.]"

\* \* \*

Lieutenant Levasseur: "**Now, I'm just going to ask you this. Like I told you, you're not under arrest. I didn't come here to get you. I came here to get your computer.**"

Defendant: "I know."

Id. at 55, 64, 68, 70.

After this exchange, Lieutenant Levasseur then asked the Defendant if he would give a written statement.

9

Lieutenant Levasseur: **"Would you be willing to give me a written statement …[.]"**

Defendant: **"Yes, please."**

Lieutenant Levasseur: **"You can explain yourself. Are you willing to give me a written statement?**

Defendant: **"Yes."** (inaudible).

Lieutenant Levasseur: **"All right. I need you to get dressed for me. It's so hot in here. I can't take it. I need you to get dressed, and we'll do a statement outside in my car . . . [.]"**

Defendant: **"But there's people. I don't want them to see me."**

Lieutenant Levasseur: "Is there a cooler place than this?"

Defendant: "Downstairs."

Lieutenant Levasseur: "That's fine…[.]"

Id. at 70-71 (emphasis added).

Patterson testified that Lieutenant Levasseur wrote the Defendant's statement and the transcript reflects Lieutenant Levasseur's summarizing of Defendant's earlier statements. Id. at 73-79. After six pages of this summarizing, Lieutenant Levasseur tells the Defendant: "Now don't let me put words in your mouth." Id. at 79. Yet, Lieutenant Levasseur continued to suggest language. Id. at 79-82. This dialogue is reflected below.

Lieutenant Levasseur: Would you be willing to give me a written statement saying that you can - - **you can explain yourself in this written statement, saying that, you know, you down - - periodically for the last three years, you downloaded some child porn files, but you are not interested in kids.**

Mr. Tummins: Yes, please.

Lieutenant Levasseur: You can explain yourself. Are you willing to give me a written statement?

Mr. Tummins: Yes. (Inaudible)

10

Lieutenant Levasseur: 9809. Okay. **So I'm not into making big, long statements and everything, so I'm going to surmise [sic] everything. But I want your version of it on written statement so - -**

Mr. Tummins: Okay.

Lieutenant Levasseur: Basically, you stated that for approximately the last three years - -

Mr. Tummins: Yes.

Lieutenant Levasseur: - - you have downloaded some child porn files amongst with - -

Mr. Tummins: All others.

Lieutenant Levasseur: - - all other type files, but you found yourself drawn to the child porn files out of a curiosity - -

Mr. Tummins: Yeah, I wouldn't say - -

Lieutenant Levasseur: - - rather than being seeking gratification.

Mr. Tummins: Yes. I don't –I'm not involved in that at all

Lieutenant Levasseur: Now, that I know that you have downloaded movies, but was there ever any pictures or was it just the movies?

Mr. Tummins: Usually it's movies. don't remember--

Lieutenant Levasseur: But sometimes, was it pictures? Because, you know, I'm going to get them back.

Mr. Tummins: I don't remember. I would say no, because I don't—I—don't

Lieutenant Levasseur: Okay.

Mr. Tummins: --usually—

Lieutenant Levasseur: So I'll just - - because I don't want - - I don't want - - you know, I don't want your statement to conflict with what I'm going to find on the computer.

Mr. Tummins: Well, I don't remember any pictures.

Lieutenant Levasseur: But movies mostly?

Mr. Tummins: It's 99 - - - everything I download is the (Inaudible)

Lieutenant Levasseur: And it's always been from Limewire?

Mr. Tummins: Now that I don't know. Usually I use Limewire because that was - - I mean, that's pretty - - if I wanted something because if I wanted something (Inaudible).

Lieutenant Levasseur: Is there any other application you might have used to download child porn files?

Mr. Tummins: Oh, gosh. I'm trying to think of the site. It had a pirate ship as a logo. Maybe with pirate - - is there such thing as pirate download, pirate - -

Lieutenant Levasseur: You're talking about porn? Pirate porn?

Mr. Tummins: I don't know.

Lieutenant Levasseur: It's a file sharing.

Mr. Tummins: - - porn, is that the green symbol thing?

Lieutenant Levasseur: No, that's Limewire. I know what you're talking about. There's a pirate ship, but it's not a website, it's a file-sharing site, correct?

Mr. Tummins: Okay. I don't - -

Lieutenant Levasseur: If that's what I'm thinking.

Mr. Tummins: I would go with that download (Inaudible)

Lieutenant Levasseur: Limewire and other sharing applications?

Mr. Tummins: Yes, because I don't know what they were. To be honest, I'm not even sure (Inaudible).

Lieutenant Levasseur: Now, there is something that's serious, and a serious thing is distribution of child porn, but you are guilty of distribution because I downloaded it from you, but your explanation to me that you thought that you disabled it is - -

Mr. Tummins: I didn't - -

Lieutenant Levasseur: - - that is - - that is enough for me to believe - -

Mr. Tummins: I really didn't.

Lieutenant Levasseur: - - that you didn't want to share them. Now, I'm going to put in your statement that you - - you believed that you had disabled - -

Mr. Tummins: Yes.

Lieutenant Levasseur: - - the sharing capacity of your - -

Mr. Tummins: Yes. And I - -

Lieutenant Levasseur: - - of your share folder.

Mr. Tummins: I don't go back and I'm not taking from Limewire. I looked at - - I surfed the thing and see if they're there, right. I mean, there's preferences and things, but I don't mess with all that. I mean, they'll be in default. But I really thought - - because you can get viruses. I have done them before, screwed up my own computer. Yes, I thought - - there was no way - -

Lieutenant Levasseur: Hey, you're - - you were honest when you said that up there. That's good enough for me. Do you understand?

Mr. Tummins: Okay. It's just I can't - - the idea.

Lieutenant Levasseur: And I assume that you disabled it because you didn't want to share those files that you were downloading?

Mr. Tummins: Well, I don't want to share that and I also don't want to get whatever there - - you know, because they can get into the computer.

Lieutenant Levasseur: They can't.

Mr. Tummins: Oh, they can't.

Lieutenant Levasseur: No.

Mr. Tummins: See, I thought they could, so I didn't want other people - -

Lieutenant Levasseur: To get those child porn files?

Mr. Tummins: - - to get anything - - anything, anything I had.

Lieutenant Levasseur: But, I mean, you didn't want them to get a child porn file?

13

Mr. Tummins:  That's right.

Lieutenant Levasseur:  Shared (inaudible) because I didn't want - - I didn't want to share anything, especially the child porn, correct?  Now, don't let me put words in your mouth.

Mr. Tummins:  No, that's all right.  I mean, saying especially that means that I gave that special attention.  I didn't give that anymore - -

Lieutenant Levasseur:  Okay.

Mr. Tummins:  - - attention - -

Lieutenant Levasseur:  Okay.

Mr. Tummins:  - - than anything else.

Lieutenant Levasseur:  I didn't.

Mr. Tummins:  I disabled - -

Lieutenant Levasseur:  Yeah.  I disabled the sharing of my share folder, because I didn't - -

Mr. Tummins:  I mean, that makes it sound like I really thought about that.  And I didn't think that that - -

Lieutenant Levasseur:  - - want to share the files - -

Mr. Tummins:  At all, period

Lieutenant Levasseur:  - - I downloaded.  All right.  I - - before I write this out, let me ask you if this is correct, I downloaded - - when I downloaded child porn files, it was out of curiosity and not - -

Mr. Tummins:  That's all; that's all.  Oh, my gosh.

Lieutenant Levasseur:  When I downloaded child porn files - -

Mr. Tummins:  See, I don't know the key words people look for, I mean, because you're in this all the time, I'm sure there's key words that people say, and I just don't know them.

Lieutenant Levasseur:  When I downloaded child porn files, it was out of - - you're a teacher, how do you spell curiosity?

Mr. Tummins: C-U-R-I-O-U-S-I-T-Y.

Lieutenant Levasseur: And not for sexual gratification.

Mr. Tummins: The part that's hard to explain is why are you even curious about it. I mean, that's that part (Inaudible) I went there anyways. See what I'm saying.

Lieutenant Levasseur: You made some big mistakes, and you're going to have to make sure you don't make those same mistakes again.

Mr. Tummins: What you told me about it happening over and over. (Inaudible).

Lieutenant Levasseur: I do not remember how many I downloaded.

Mr. Tummins: Because they were in with other things. I mean, I just wasn't looking for that.

Lieutenant Levasseur: I don't remember. I downloaded but over - -

Mr. Tummins: Okay. I have had that computer since about - - the big one, the desktop, since about December. Okay. Now, there's a laptop, is what I'm telling you. That's the one that has - - that's the one that (Inaudible).

Lieutenant Levasseur: The one back at Austin Peay?

Mr. Tummins: I had that one at Austin Peay and before I - - let's see, that one shut down.

Lieutenant Levasseur: Okay.

Mr. Tummins: And before that one shut down all the way, before I could afford a new one (Inaudible).

Lieutenant Levasseur: I'm going to write this in here, if it's okay with you.

Mr. Tummins: Okay.

Lieutenant Levasseur: I knew what I was doing was wrong, but I have never had a sexual desire in children.

Mr. Tummins: My motives were never - - never - - never sexual in nature. (Inaudible)

Lieutenant Levasseur: You didn't know what you were doing was wrong, and you don't have - -

Mr. Tummins: That's the shame of it all. It's not that I didn't - - I didn't know why I would do that. The ones who actually do this do they come for all the - -

Lieutenant Levasseur: Huh?

Mr. Tummins: (Inaudible)

Lieutenant Levasseur: Yes. They - - people that look at child in my history, they range from all age ranges.

Mr. Tummins: No to look at it, but the actual ones who abuse children.

Lieutenant Levasseur: All age ranges and all classes of people. Now, let me read this off to you before you sign it. Over the last three years, I have downloaded child porn movies from Limewire and other sharing programs. I believed that I disabled the sharing of my shared folder because I didn't want to share the files I downloaded. When I downloaded child porn files, it was out of curiosity and not for sexual gratification. I don't remember how may I downloaded over the last three years. I did know that what I was doing was illegal, but I have never been attracted to children sexually. I just did it out of curiosity. I gave this statement freely. Is this correct?

Mr. Tummins: Yes.

Lieutenant Levasseur: Do you want to sign it for me?

Mr. Tummins: Okay.

Id. at 70-71, 74-83.

After the Defendant signed the statement, the following exchange occurred between officers and the Defendant:

Detective Patterson: "You have the right to talk with the district attorney's office regarding this. They will be the agency that's going to prosecute the case. You have a right to talk to them."

\* \* \*

Defendant: "[W]ill they just not understand because we won't have a conversation like we have had here."

\* \* \*

cv

Lieutenant Levasseur: "I will contact you before you are charged to see if you want to come in and find out what I found and sit down with me and the district attorney, the assistant district attorney and go over your case. I have done that before and I'll do it again."

\* \* \*

Lieutenant Levasseur: ". . . Hey, look at me, Jeremy, it's not the end of the world. Don't do anything stupid like hurting yourself."

~~Defendant: "I'm not.~~ **There's nothing else left to do but sit and cry and apologize and fear. That's all there is.**"

Id. at 97, 98, 100, 106-07 (emphasis added).

Patterson testified that at the end of the interview, Lieutenant Levasseur mouthed to Ms. Tummins to watch the Defendant, referring to Lieutenant Levasseur's earlier statement to the Defendant not to hurt himself.

## B. Conclusions of Law

Under the Fifth Amendment, "[N]o person … shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. When an individual is taken into police custody or otherwise deprived of his freedom by the police and is subject to questioning, procedural safeguards protect the individual's Fifth Amendment privilege against self-incrimination. The original formulation of those rights was stated in Miranda v. Arizona, 384 U.S. 436, 445-57 (1966) that was based upon the Supreme Court's review of police manuals on modern interrogation tactics that the Court cited as "psychologically rather than physically oriented." Id. at 448. Given those techniques, the Supreme Court set certain procedural requirements to protect the person who is subject to custodial interrogation.

Today, then, there can be no doubt that **the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. We have concluded**

17

that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

\* \* \*

In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent—the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present. As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it.

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

This does not mean, as some have suggested, that each police station must have a "station house lawyer" present at all times to advise prisoners. It does mean, however, that if police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation. If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the

person's Fifth Amendment privilege so long as they do not question him during that time.

Id. at 467, 473-74 (emphasis added and footnotes omitted).

The Supreme Court later explained, "[t]he concern of the Court in Miranda was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." Rhode Island v. Innis, 446 U.S. 291, 299 (1980) (quoting Miranda, 384 U.S. at 457-458). "Fidelity to the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." Berkemer v. McCarty, 468 U.S. 420, 437 (1984).

As a matter of law, "[t]he Courts must presume that a defendant did not waive his [Miranda] rights; the prosecution's burden is great; but in at least some cases waiver can clearly be inferred from the actions and words of the person interrogated." North Carolina v. Butler, 441 U.S. 369, 373 (1979). "[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Miranda, 384 U.S. at 475.

In Miranda, the Supreme Court held that "if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent." Id. at 467-68. Thus, Miranda has two core elements for its procedural protections: interrogation and custody. As to the interrogation element, there must be "express questioning or its functional equivalent," "that the police should know are reasonably likely to elicit an incriminating response." Innis, 446 U.S. at 301. As to the "functional equivalent" in Innis, the Supreme Court explained:

19

"The Court in <u>Miranda</u> also included in its survey of interrogation practices the use of psychological ploys, such as to 'posi[t]' 'the guilt of the subject,' to 'minimize the moral seriousness of the offense,' and 'to cast blame on the victim or on society.' It is clear that these techniques of persuasion, no less than express questioning, were thought, in a custodial setting, to amount to interrogation."

<u>Id.</u> at 299 (quoting <u>Miranda</u>, 384 U.S. at 450) (with footnote omitted).

Here, given the subject of the search warrant and the prior probable cause finding by the state court judge about the Defendant's possession of child pornography, the Court finds that officers' initial and subsequent questions to the Defendant about his computer use, his familiarity with Limewire and downloading of movies, would elicit incriminating responses from the Defendant, as the transcript of the search reveals. Thus, the Court concludes that the first element for <u>Miranda</u> is clearly shown.

The custody element for <u>Miranda</u> warnings is established if a "'person has been taken into custody or otherwise deprived of his freedom of action in any significant way,'" <u>California v. Beheler</u>, 463 U.S. 1121, 1124 n.2 (1983) (quoting <u>Miranda</u>, 384 U.S. at 444) or his freedom of action has been curtailed to a "degree associated with a formal arrest." <u>Id.</u> (quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977). In applying these principles, the Court is required to inquire "how a reasonable man in the suspect's position would have understood his situation." <u>Berkemer</u>, 468 U.S. at 442. "Coercion is determined from the perspective of the suspect." <u>Illinois v. Perkins</u>, 496 U.S. 292, 296 (1990) (citing <u>Innis</u>, 446 U.S. at 301 and <u>Berkemer v. McCarty</u>, 468 U.S. at 442). As the Supreme Court recently stated:

Any police interview of an individual suspected of a crime has "coercive aspects to it." <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495. (1977) (<i>per curiam</i>). Only those interrogations that occur while a suspect is in police custody, however, "heighte[n] the risk" that statements obtained are not the product of a suspect's free choice. <u>Dickerson v. United States</u>, 530 U.S. 428, 435 (2000).

By its very nature, custodial police interrogation entails "inherently compelling pressures." Miranda, 384 U.S. at 467. Even for an adult, the physical and psychological isolation of custodial interrogation can "undermine the individual's will to resist and … compel him to speak where he would not otherwise do so freely." Id. Indeed, the pressure of custodial interrogation is so immense that it "can induce a frighteningly high percentage of people to confess to crimes they never committed."

J.D.B. v. North Carolina, 131 S.Ct. 2394, 2401 (2011).

The Court must also consider the totality of the circumstances, United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1988), and whether the atmosphere at issue generated "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" Miranda, 384 U.S. at 467. See also Tankleff v. Senkowski, 135 F.3d 235, 244 (2d Cir. 1998) (citing United States v. Morales, 834 F.2d 35, 38 (2d Cir. 1987) (a custodial setting is evidenced by "inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak")).

As to Miranda's application in the context of police questioning at a defendant's residence, the inquiry is whether a reasonable person in that position would "have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995). Yet, the "[t]o be 'free' to leave is a hollow right if the one place the suspect cannot go is his own home." United States v. Craighead, 539 F.3d 1073, 1083 (9th Cir. 2008).

In Oregon v. Elstad, 470 U.S. 298, 316 (1983), the Supreme Court held that a defendant's response to an officer's brief question at the Defendant's residence while the other officer informed the defendant's mother of his arrest, did not constitute custodial interrogation for Miranda purposes because that brief questioning had "none of the earmarks of coercion."

Elstad's holding gave rise to what the Supreme Court later described as the "question first" tactic in which police officers secure a statement without Miranda warnings and then, later take a second statement with Miranda warnings. In Missouri v. Seibert, 542 U.S. 600 (2004), the Supreme Court held the "question first" tactic without warning to be a circumvention of Miranda and violative of Miranda's central concern about coercive police tactics[4].

In United States v. Panak, 552 F.3d 462, 466 (6th Cir. 2009), the Sixth Circuit stated the general rule that "an in-home encounter between the police and a citizen generally will be non-custodial." Yet, in the context of purported booking questions at a defendant's residence, the Sixth Circuit later stated: "questioning . . . in a private home during the investigatory stage of criminal proceedings would undermine the particulars that Miranda seeks to afford criminal suspects." United States v. Pacheco-Lopez, 531 F.3d 420, 425 (6th Cir. 2008).

For home interrogations to determine if custody exists for the in-home interview, the Sixth Circuit's standard is whether under the totality of the circumstances the person retained the ability "to ask the investigators to leave." Panak, 552 F.3d at 468. In determining this issue, the Sixth Circuit later listed the following "guides": "(1) the location of the interview; (2) the length

---

[4] As Miranda recognized.

> "Patience and persistence, at times relentless questioning, are employed. To obtain a confession, the interrogator must 'patiently maneuver himself or his quarry into a position from which the desired objective may be attained.' When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advice. It is important to keep the subject off balance.... The police then persuade, trick, or cajole him out of exercising his constitutional rights."

384 U.S. at 455(footnote omitted).

and manner of the questioning;[5] (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." United States v. Hinojosa, 606 F.3d 875, 883 (6th Cir. 2010) (citing Panak, 552 F.3d at 465). Panak also listed, "[t]he number of officers, the show of authority, the conspicuous display of drawn weapons, the nature of the questioning all may transform one's castle into an interrogation cell-turning an inherently comfortable and familiar environment into one that a reasonable person would perceive as unduly hostile, coercive and freedom-restraining." Panak, 552 F.3d at 466 (citing, inter alia Craighead, 539 F.3d at 1083). The Supreme Court referred to the ultimate inquiry of custody as whether the interrogation created a "police dominated atmosphere," Perkins, 496 U.S. at 296 (quoting Miranda, 384 U.S. at 445).[6] As the Sixth Circuit

---

[5] The Second Circuit refers to this factor as "the language and tone used by the police," Tankleff, 135 F.3d at 244. See also United States v. Guarno, 819 F.2d 28, 31-32 (2d Cir.1987).

[6] Other circuits conduct similar inquiries whether a home interrogation creates a "police dominated atmosphere." In Craighead, the Ninth Circuit referred to the ultimate issue as whether "the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a "police-dominated atmosphere." 539 F.3d at 1083 (9th Cir. 2008). Craighead explained that:

> "Our approach of using the "police-dominated atmosphere" as the benchmark for custodial interrogations in locations outside of the police station is consistent with the Supreme Court's adaptations of Miranda to these types of locations. See Berkemer, 468 U.S. at 438-39 (Miranda warnings are not required at an ordinary traffic stop because the atmosphere there "is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in Miranda itself"). This approach has also been taken by our sister circuits that have considered whether an in-home interrogation was "custodial" under Miranda. See, e.g., United States v. Revels, 510 F.3d 1269, 1275 (10th Cir.2007) (concluding that the suspect's home had become a "police-dominated environment" because "the facts belie any conclusion that [the suspect's] home, on the morning of the questioning at issue, was the traditional comfortable environment that we normally would consider a neutral location for questioning."); United States v. Mittel-Carey, 493 F.3d 36, 40 (1st Cir. 2007) (finding suspect was in custody although interrogated in his home

recently explained in <u>Dixon v. Houk</u>, 627 F.3d 553, 557 (6th Cir. 2010), a "'police strategy

adapted to undermine the <u>Miranda</u> warnings' renders the confession inadmissible 'because the

tactic threatens to thwart <u>Miranda's</u> purpose of reducing the risk that a coerced confession would

be admitted.' <u>Elstad</u> itself is clear, and <u>Seibert</u> simply reinforced its meaning." (quoting <u>Seibert</u>,

542 U.S. at 617).

Applying the factors cited above, the Sixth Circuit[7] in <u>Panak</u> found a home

interview in the following factual scenario to be non-custodial.

> . . . The encounter began when the investigators knocked on Panak's door,
> Panak answered and the **investigators told her that they wanted to ask
> her a few questions about Chionchio. Recognizing the two men from
> the prior week's inspection, Panak "let them in." During the
> interview, Panak sat on her living-room couch, while the investigators
> sat in chairs. The interview lasted "[b]etween 45 minutes and an
> hour," a length of time that compares favorably with other encounters
> we have deemed non-custodial.**

> because of the "level of physical control that the agents exercised over" the
> suspect); <u>Sprosty v. Buchler</u>, 79 F.3d 635, 641 (7th Cir. 1996) ("More important
> than the familiarity of the surroundings where [the suspect] was being held is the
> degree to which the police dominated the scene."); <u>United States v. Griffin</u>, 922
> F.2d 1343, 1354-55 (8th Cir. 1990) ("Questioning which occurs in the suspect's
> own home may provide a margin of comfort, but ... the setting of the interrogation
> is not so important to the inquiry as the question of police domination of that
> setting.").

<u>Id.</u>

[7] For other circuits, *see e.g.*, <u>United States v. Hargrove</u>, 625 F.3d 170, 175 182 (4th Cir. 2010)
(home interrogation beyond initial entry was not custodial where the defendant was subject to
pat-down for a search by armed officers, was told he was not subject to arrest was free to go and
defendant was "cooperative loquacious and expressing an interest in working undercover") and
<u>United States v. Revels</u>, 510 F.3d 1269, 1270-71, 1276-77 (10th Cir. 2007) (custodial
interrogation requiring <u>Miranda</u> warnings where seven officers involved in executing a search
warrant, the defendant was handcuffed, place face down on the floor and after search warrant
was completed, an officer confronted the defendant with drugs and questioned the defendant
without <u>Miranda</u> warnings).

During the interview, the officers did not handcuff Panak or physically restrain her, and they did not otherwise limit her freedom of movement. She was never told that she could not leave, that she could not ask the investigators to leave or that she was required to answer their questions. **Nobody raised his voice, the investigators did not possess, much less brandish, firearms or handcuffs, and the investigators arrived at her home in an unmarked DEA Trail Blazer**. Although they began the interview by telling her "[y]our boss is going to jail," and questioned her about her knowledge of Chionchio's abuse and illegal distribution of hydrocodone, **the investigators never threatened Panak with arrest, never told her that she was in trouble, never told her that she was a suspect and never told her that she was potentially subject to criminal penalties. At the end of the interview, the officers did not arrest Panak or even suggest that they would; they simply thanked her and left.**

**Consistent with the non-threatening and cooperative nature of this interview, one of the investigators called Panak several months later with some follow-up questions**. Panak answered the questions and does not complain about this follow-up interview.

One factor, it is true, cuts in the other direction . . . **the officers never told Panak that she need not answer their questions or could end the interview at will. But the existence of such advice is one factor among many, and we have never held that it is a necessary condition (as opposed to a frequently sufficient condition) before officers may question an individual in a non-custodial setting. . . [.]**

552 F.3d at 466-67 (citations and parenthetical notations omitted with emphasis added).

In <u>United States v. Flores</u>, 193 Fed. Appx. 597, 2006 WL 2497955 (6th Cir. Aug. 26, 2006), the Sixth Circuit found another home interview to be non-custodial where:

The totality of the circumstances in this case demonstrate that Flores was not in custody when questioned by the officers. The **questioning occurred in Flores's home after he had voluntarily consented to the officers entering his residence to look for Villa. The officers were not present to investigate Flores or because they suspected him of committing a crime. Flores was not handcuffed, confined, or restrained; he sat on the living room sofa, and according to Detective Earl they had a "casual conversation."** At one point, Flores took Detective Earl to the garage and then returned to the living room. There is no indication that his movements were restricted. **The officers were in the house for only about thirty minutes, and there is no testimony or showing that the officers surrounded Flores during the questioning. In addition, Flores was told that he would not be arrested that day. All of these factors**

25

indicate that Flores was not subjected to custodial interrogation and not deprived of his freedom in any substantial way. Therefore no <u>Miranda</u> warning was required.

<u>Id.</u> at 606 (emphasis added).

In <u>United States v. Jewell</u>, 16 Fed. Appx. 295, 2001 WL 599715 (6th Cir. May 23, 2001), the Sixth Circuit concluded that the execution of a search warrant at a Defendant's residence did not create a custodial situation.

> These facts reveal that Jewell was not in custody. **Jewell was informed upon arrival at his residence that he was not under arrest and would not be placed under arrest that day. Jewell voluntarily entered the residence during the search and he admitted that the agent told him he was free to leave if he desired. He also acknowledged that the agent's actions and words were not hostile or coercive. The questioning only lasted approximately an hour.** While Jewell's movements inside the residence were limited [confined to the kitchen area], the supervising agent testified that this action was taken for the safety of the searching officers.

<u>Id.</u> at 298 (emphasis added).

As a threshold matter, prior to their arrival, the officers here had provided a state judge with sufficient facts to establish probable cause to tie the Defendant and his computer to child pornography. The search warrant represents an objective basis that the officers had specifically focused on the Defendant prior to the officers' arrival at the Defendant's residence to question him. To be sure, "a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of <u>Miranda</u>," <u>Stansbury v. California</u>, 511 U.S. 318, 324 (1994), but "[a]n officer's knowledge or belief may bear upon the custody issue, if they are conveyed, by word or deed, to the individual being questioned." <u>Id.</u> at 325.

Here, despite their possession of the search warrant, the officers initially requested to enter Defendant's home to question him as part of their "investigation." After the Defendant granted the officers' permission to enter, the officers did not initially mention the warrant, but proceeded to question the Defendant and elicit incriminating issues about his computer and his computer use. Only on page 7 of the transcript, after a series of incriminating questions, did Lieutenant Levasseur announce that the officers had a search warrant for the seizure of the Defendant's computers. On page 13, after Lieutenant Levasseur continued to elicit additional incriminating answers, Lieutenant Levasseur stated: "Like I told you, you're not under arrest. I didn't come here to get you. I came here to get your computer." Yet, Lieutenant Levasseur later asked the Defendant to provide a written statement and dictated the Defendant's statement. There are only seven pages with express references to Lieutenant Levasseur's searching of the Defendant's computer. (Docket Entry No. 51-1, Transcript at 13, 29, 85, 91, 95 104 and 105). The Court concludes that the officers' knowledge about the Defendant prior to the search warrant favors a finding of custody. There was only limited reference to the search warrant and the officers were there to investigate the Defendant. This finding is underscored by the limited references in the transcript to the search warrant.

### "(1) The location of the interview"

As to this factor, the questioning occurred at the Defendant's residence that generally does not present a coercive environment, but as the Defendant's wife stated: "We are not used to having the law people come in to our home". (Docket Entry No. 51-1 at 49). The officers went to the residence to execute a search warrant relating to child pornography. The initial questioning, however, was about the Defendant's computer use and cable and internet access, including his

possession of a cable modem without a wireless router, a significant fact to the officers. The officers then mention the warrant, but continue to question the Defendant about his knowledge and familiarity with Limewire, a file sharing service often containing child pornography, the frequency of his downloading of child pornography and the age of children requested. All of these questions eliciting incriminating answers were asked without **any** Miranda warnings.

### "(2) The length and manner of the questioning"

As to the duration, the officers were at the Defendant's residence for approximately two hours with the critical questioning commencing almost immediately upon the officers' arrival. As to the length of time of the questioning alone, the officers' two hours at Defendant's residence fall within the range of Sixth Circuit's non-custodial findings, given the search warrant for a computer seizure. See e.g., United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999) (hour and half interview at work, including time spent changing rooms, held non-custodial); Panak, 552 F.3d at 467 (forty-five minutes to one hour home interview held non-custodial); United States v. Felner, Case No. 3:08cr119, 2009 WL 1542710, at *4 (W.D. Ky. June 2, 2009) (six hour search warrant execution, with a long period of the time without questioning, held non-custodial). The Court, however, concludes that the Government has not shown that this amount of time was necessary to seize the Defendant's two computers and any related equipment that the search warrant authorized. Despite the search warrant, the officers stated their initial purpose was to question the Defendant about their investigation. Lieutenant Levasseur's subsequent and persistent questioning supports at least an inference that the two hours was to get the Defendant's answers to Lieutenant Levasseur's questions. The Defendant's wife describes this questioning as accusatory, hostile and "very harsh". (Docket Entry No. 51-1 at 49).

As to the manner of the investigation, the officers did not show force nor brandish their visible firearms nor use their handcuffs. Despite their presence under the search warrant, Lieutenant Levasseur's first statement to the Defendant was that he wanted to "talk" to the Defendant. Upon entry into the Defendant's residence, Lieutenant Levasseur engaged the Defendant in questioning about the Defendant's computer use, downloading of child pornography, and familiarity with the file sharing program Limewire.

In several statements over the two hour interview, Lieutenant Levasseur actually charged the Defendant with criminal conduct and demanded answers from the Defendant: "I have two options . . . I can take it federally or state;" "I'm giving you the opportunity to help yourself;" "you've **got** to explain it to me;" "I'm only going to ask it one more time and I'm not asking it again. I want an explanation;" and "I've **got** you dead to rights for this." As an objective measure, Lieutenant Levasseur's and Patterson's questions and comments represented 50% of the transcript. To be sure, Defendant and Ms. Tummins asked numerous questions during this time period, but those questions reflect the extensiveness of Lieutenant Levasseur's questioning. Defendant's wife was present, but at times, she was separated from her husband. The transcript of the search also reflects that Lieutenant Levasseur dictated or restated the Defendant's earlier statements for his written statement that Lieutenant Levasseur actually wrote. These facts establish Lieutenant Levasseur's dominance of this interview.

Patterson described the interview environment as hostile when the Defendant disclosed to Lieutenant Levasseur that he was a school teacher. Yet, that fact was known at least to Patterson prior to their arrival at the Defendant's residence. The Defendant's wife described Lieutenant Levasseur's questioning as "very harsh" and stated Lieutenant Levasseur was "automatically

accusing" the Defendant. Lieutenant Levasseur conceded that he had become a "little harsh." Patterson agreed that Lieutenant Levasseur used a "more aggressive" tone and attributed the reaction to the fact that Defendant was a school teacher, but that fact was known at least by Patterson prior to the officers' arrival at the Defendant's home. Although Patterson testified the overall tone of the encounter was non-hostile, the Defendant's wife's statements reflect otherwise. Those comments are at pages 49 and 50, less than halfway through the 109 page transcript. By page 68, the Defendant is crying before he agreed to Lieutenant Levasseur's request to give a written statement. The manner of questioning is the critical factor here.

The Court concludes that the subject, nature and manner of Lieutenant Levasseur's aggressive questioning of the Defendant after the officers' investigation for the search warrant had already established probable cause for the Defendant's possession of child pornography on his computer, falls under the prohibited practice described by the Sixth Circuit in Pacheco-Lopez. There, the Government sought to characterize the questions at the Defendant's residence as falling under booking exception to Miranda. The Sixth Circuit declined to accept that characterization and stated: "questioning . . . in a private home during the investigatory stage of criminal proceedings would undermine the particulars that Miranda seeks to afford criminal suspects." 531 F.3d at 425. The Sixth Circuit ruled that such questioning violated Miranda. Id. Here, the Court concludes that the officers engaged in investigatory questioning of the Defendant in his residence, as revealed by their prior investigation of the Defendant and the search warrant for his computers as we;; as the officers' initial announcement that they were at the Defendant's residence of their "investigation."

**"(3) Whether there was any restraint on
the individual's freedom of movement"**

As to restrictions on Defendant's freedom of movement, Defendant was not handcuffed nor required to remain in one part of the residence. Detective Patterson's uncontradicted testimony is that Defendant was left alone at one point. At other times, Lieutenant Levasseur gave Defendant verbal commands, such as to sit down, not to touch his computers, and most significantly, to answer the question and "look at me straight in the face . . . Straight as you can. Close your eyes. Don't blink. Don't do nothing." (Docket Entry No. 51-1, Transcript at 64). Lieutenant Levasseur also requested the Defendant to accompany him to his patrol car to complete the written statement, but Defendant declined for fear of public embarrassment and they remained in the residence for Lieutenant Levasseur's dictation of Defendant's written statement. In the Court's view, the critical fact here is Lieutenant Levasseur's psychological dominance of the Defendant, not the Defendant's physical movement.

### "(4) Whether the individual was told that he or she did not need to answer the questions"

As to the final factor, Lieutenant Levasseur told the Defendant that he was not under arrest, but this statement is on page 8 of the transcript that is after Lieutenant Levasseur's initial series of questions eliciting incriminating answers from the Defendant. At page 13 of the transcript after additional initial incriminating questions and answers, Lieutenant Levasseur again told Defendant: "You are not under arrest right now. I'm not here for you, I'm here for your computer, okay." Lieutenant Levasseur also made comments to the Defendant that "you don't have to answer" and "I'm not here for you." Those latter comments are on pages 45 and 70 of the transcript. Yet, these latter statements are long after Lieutenant Levasseur's questions that secured incriminating answers on pages 3-21. On one occasion, Lieutenant Levasseur told the Defendant that he did not have to answer the question, but that was approximately one hour

(estimated by its location in the transcript) after Lieutenant Levasseur's commencement of his questions eliciting incriminating answers.

In light of the totality of the circumstances, the Court concludes that a reasonable person in the Defendant's position would view Lieutenant Levasseur's aggressive questioning of him at his residence to have created an environment that did not enable the Defendant to tell the officers to leave or to terminate the interview. Lieutenant Levasseur raised many substantive issues of his ability to prosecute the Defendant either in federal or state court and made aggressive remarks about the Defendant's guilt. Lieutenant Levasseur inquired whether the Defendant was a pedophile and demanded information and emphasized the inevitability of the computer search. Thus, the Court concludes that the home interrogation here was a custodial interrogation for which <u>Miranda</u> rights were required, and without which the Defendant's Fifth Amendment right against self-incrimination was violated.

The Government requests that, "[a]lternatively, should the Court conclude that the interview became custodial, the United States requests that the Court identify at what point . . . the interview became custodial and only suppress statements made after that point," (Docket Entry No. 44, at 3), citing <u>United States v. Hinojosa</u>, 606 F.3d 875 (6th Cir. 2010). Yet, the Court considers this request is not warranted here because the Court concludes that these officers' deliberate tactic of questioning the Defendant without **any** Miranda warnings at **any** time was "a calculated way to undermine the <u>Miranda</u> warning". <u>Seibert</u>, 542 U.S. at 622 (Kennedy J., concurring)[8]. As the Sixth Circuit stated "questioning . . . in a private home during the investigatory stage of criminal proceedings would undermine the particulars that <u>Miranda</u>

---

[8] Justice Kennedy's concurring opinion to the plurality opinion in <u>Seibert</u> is considered to state the controlling principle of <u>Seibert</u>. See <u>Pacheco-Lopez</u>, 531 F.3d at 427 n. 11.

seeks to afford criminal suspects." Pacheco-Lopez, 531 F.3d at 425. Such circumvention requires

suppression of all of the Defendant's statement: "[A] police strategy adapted to undermine the

Miranda warnings renders the confession inadmissible 'because the tactic threatens to thwart

Miranda's purpose of reducing the risk that a coerced confession would be admitted.' Elstad

itself is clear, and Seibert simply reinforced its meaning." Dixon, 627 F.3d at 557 (quoting

Seibert, 542 U.S. at 617).

     For these reasons, the Court concludes that the Defendant's incriminating responses to

the officer's initial questioning[9] should be suppressed. In these circumstances, the Court

---

[9] Based upon Miranda's consideration of police manuals on interrogation, the Court notes that albeit in a dissenting opinion in Elstad, Justice Brennan also cited interrogation manuals about the significance of police officer's securing an initial incriminating statement:

> Our precedents did not develop in a vacuum. They reflect an understanding of the realities of police interrogations and the everyday experience of lower courts. Expert interrogators, far from dismissing a first admission ... understand that such revelations frequently lead directly to a full confesssion. Standard interrogation manuals advise that "[t]he securing of the first admission is the biggest stumbling block...." A. Aubry & R. Caputo, Criminal Interrogation 290 (3d ed. 1980). If this first admission can be obtained, "there is every reason to expect that the first admission will lead to others, and eventually to the full confession." Ibid.

> "For some psychological reason which does not have to concern us at this point 'the dam finally breaks as a result of the first leak' with regards to the tough subject.... Any structure is only as strong as its weakest component, and total collapse can be anticipated when the weakest part first begins to sag." Id. at 291.

> Interrogators describe the point of the first admission as the "breakthrough" and the "beachhead," R. Royal & S. Schutt, The Gentle Art of Interviewing and Interrogation: A Professional Manual and Guide 143 (1976), which once obtained will give them enormous "tactical advantages," F. Inbau & J. Reid, Criminal Interrogation and Confessions 82 (2d ed. 1967). See also W. Dienstein, Techniques for the Crime Investigator 117 (2d ed. 1974). Thus "[t]he securing of incriminating admissions might well be considered as the beginning of the final stages in crumbling the defenses of the suspect," and the process of obtaining such admissions is described as "the spadework required to motivate the subject into making the full confession." Aubry & Caputo, supra, at 31, 203.

concludes that all of the Defendant's statements without any <u>Miranda</u> warnings at any time should be suppressed.

If consideration of the Government's request were warranted, the Court would consider the totality of the circumstances during the initial stages of the interview applying the <u>Hinosoja</u> and <u>Panak</u> factors and relevant precedents. Here, at first blush, Defendant's responses at the beginning of the officer's interrogation would not appear to be custodial for the initial questioning at the defendant's residence, but with the search warrant and prior to any interrogation of the Defendant, the officers had established probable cause that the Defendant actually had child pornography on his computer. This probable cause finding by the state court judge could have also been deemed sufficient to arrest the Defendant. Thus, at the time of the initial questioning, the officers were focused on the Defendant for the commission of the crime of possession of child pornography and the Defendant's initial incriminating answers suggest that the officers dominated the interrogation from the outset.

For the warning factor, in <u>Panak</u>, the Sixth Circuit listed whether the officers there told the defendant that he did not have to answer their questions or could end the interview at will. These warnings "before officers may question an individual in a non-custodial setting" is "one

---

"Once the initial admission has been made, further inducement in the form of skillfully applied interrogation techniques will motivate the suspect into making the confession." <u>Id.</u>, at 26; <u>see also id.</u>, at 33 (initial admissions are "capitalized upon by the interrogator in securing the eventual confession"). Some of these "skillfully applied" techniques involve direct confrontation of the suspect with the earlier admission, but many of the techniques are more discreet and create leverage without the need of expressly discussing the earlier admission. These techniques are all aimed at reinforcing in the suspect's mind that, as one manual describes it, " 'you're wasting your own time, and you're wasting my time, you're guilty and you know it, I know it, what's more, you know that I know it.' " <u>Id.</u>, at 234.

470 U.S. at 328-29 (Brennan, J. dissenting).

factor among many" to be considered. 552 F.3d at 466-67. To be sure, the court stated, "we have never held that it is a necessary condition (as opposed to a frequently sufficient condition) … [.]" Id. Here, the officers never told the defendant that he could terminate the interview at any time. Before questioning him, the officers did not tell the Defendant that he did not have to talk to them until after his incriminating statements in response to Lieutenant Levasseur's initial questioning on the Defendant's computer connection. When the Defendant responded modem, Patterson testified and the transcript reveals that this response caused the Defendant to be questioned further. Of course, the warning about not talking or terminating the interview, do not approach the requirements for Miranda warnings.

As to the time and location factor, the Defendant was in his residence with the officers who commenced their questioning upon entering the residence, but as the Ninth Circuit observed, the "[t]o be 'free' to leave is a hollow right if the one place the suspect cannot go is his own home." Craighead, 539 F.3d at 1083. Moreover, unlike Jewell,16 Fed. Appx. at 298, the officers here were at the Defendant's home to investigate him, as reflected by the search warrant and the officers' request to talk to the Defendant for their investigation. Within minutes of the officers' arrival, the Defendant calls for his wife because the matter was serious. As the defendant's wife stated they were not accustomed to law officers at their residence. From the Court's review of the transcript, Lieutenant Levasseur's aggressive questioning at the outset, his accusatory language causing the Defendant to cry, his directives and dictation of the Defendant's written statement lead the Court to conclude that Lieutenant Levasseur dominated this interview at its inception.

Thus, if applicable, the Court would also deem the initial aggressive questioning of the Defendant on incriminating subjects without any warnings to fall under <u>Pacheco-Lopez</u> that such "questioning . . . in a private home during the investigatory stage of criminal proceedings would undermine the particulars that <u>Miranda</u> seeks to afford criminal suspects." 531 F.3d at 425. There, the Sixth Circuit ruled that such questioning violated <u>Miranda</u>. <u>Id</u>.

To be sure, under <u>Harris v. New York,</u> 401 U.S. 222, 226 (1969), the Government can use the Defendant's statements for impeachment purposes and that appears to be the only rationale for this interrogation tactic. This ruling does not affect the seizure of the Defendant's computer with the offensive materials that the state court's warrant authorized.

As to the Sixth Amendment contention, the Government correctly notes that at the time of the questioning, the Defendant did not have a Sixth Amendment right to counsel because the prosecution of Defendant had not commenced. Thus, Defendant's Sixth Amendment rights had not attached and there was not any Sixth Amendment violation. <u>United States v. Gouveia</u>, 467 U.S. 180, 188 (1984). The reference to a defendant's right to counsel under <u>Miranda</u> is a procedural right for the protection of the Defendant's Fifth Amendment against self-incrimination.

Accordingly, the Court concludes that the Defendant's motion to suppress (Docket Entry No. 21) should be granted.

An appropriate Order is filed herewith.

**ENTERED** on this the _____ day of August, 2011.

_____
WILLIAM J. HAYNES, JR.
United States District Judge